IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER RITTENHOUSE,<br>Plaintiff, | CIVIL ACTION |
| v. | |
| GLAXOSMITHKLINE,<br>Defendant. | NO.  21-1836 |

### MEMORANDUM OPINION

Defendant GlaxoSmithKline, LLC ("GSK") moves to compel arbitration of Plaintiff Jennifer Rittenhouse's employment discrimination claims and stay proceedings pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14.[1]  For the following reasons, its motion shall be granted.

The arbitration agreement at issue in this case is part of GSK's dispute resolution program entitled "Help Employees Achieve Resolution of Their Concerns at Work" ("HEAR Program").  The program aims to handle workplace complaints in four-steps.  At each step, the methods used to resolve complaints are progressively escalated, with the fourth step of the program culminating in arbitration.  GSK first unveiled the program to its employees, including Rittenhouse, on August 1, 2018 through an email titled "Important – Your action required: new HEAR program for resolving concerns at work."  This email explained the four steps of the

---

[1] This is GSK's second motion to compel arbitration.  The Court denied its first one without prejudice because the Complaint did not mention the parties' agreement to arbitrate claims, but granted limited discovery, per *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 775-76 (3d Cir. 2013), on the validity of the agreement to arbitrate.  Now the discovery has been taken, GSK's second motion is evaluated under the standards governing summary judgment, *id.* at 776, *i.e.*, the motion will be granted if GSK "shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  The facts, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The burden of proof, however, shifts with respect to Rittenhouse's defenses against the agreement's validity and enforceability.  *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000); *Bracy v. Macy's Retail Holdings, Inc.*, 2020 WL 1953647, at *6 (E.D. Pa. Apr. 23, 2020) ("Plaintiff, as the party seeking to avoid arbitration, bears the burden of proving invalidity of the arbitration agreement.").

1

HEAR Program, explained what arbitration entails, and advised employees that they had one month to decide whether to participate in the arbitration portions of the HEAR Program. The email detailed the steps an employee needed to take to opt out: first, the employee was directed to a link to the HEAR website to "understand more about mediation and arbitration, review the HEAR Legal Agreement, which contains the terms, features and details of the program, and read the FAQs"; if the employee chose to opt out, then she was directed to "complete, sign and submit the HEAR Opt-Out Form – available on the HEAR site – by midnight on August 31, 2018." The employee was further warned that, "[i]f you continue your employment with GSK/ViiV after midnight on August 31 without opting out, you will have accepted the terms and conditions of the HEAR Legal Agreement and will be covered by all 4 steps of the HEAR program, including mediation and arbitration."

The HEAR website included more descriptions of the HEAR Program, a frequently asked questions page, and the arbitration agreement. The arbitration agreement could be accessed via hyperlinks highlighted in blue text throughout the front page of the site. It could also be accessed by clicking "HEAR Legal Agreement" on the menu bar located on the left-side of the webpage. In relevant part, the agreement provided, "Except as included in section 2 below, 'Claims Not Covered by this Agreement,' all concerns, disputes, claims, complaints, or controversies that involve legally protected rights ('Claims') that you have now or may have in the future against GSK/ViiV . . . arising out of and/or directly or indirectly related to your application for employment with GSK/ViiV, and/or your employment with GSK/ViiV . . . and/or the termination of your employment with GSK/ViiV. . . ." and expressly included claims arising under Title VII and the ADEA.

Before the August 31, 2018 opt-out deadline passed, Rittenhouse received an email from

her supervisor, Magdalene Pedersen.  She forwarded GSK's first email with a note to, "prompt your teams to ensure they're making a decision about opting in/opting out of the HEAR programme by 31 August."  The email further noted that although supervisors, such as Pedersen and Rittenhouse, "cannot provide advice or guidance on the decision" they should make sure employees were aware of the deadline.  At some point prior to the deadline, Rittenhouse states in an affidavit that she asked Pedersen questions regarding the HEAR program and was told "You don't need to do anything."  Based on this, Rittenhouse understood that by not taking further action, she would not participate in the program.

Contemporaneous with Pedersen's email, also before the opt-out deadline, GSK sent a second email which advised employees no less than three times that they could opt out of the arbitration portion of the HEAR program and that they had until August 31 to do so.  This email, in three places, also contained a hyperlink to the HEAR website again encouraging employees to review the HEAR Legal Agreement.  It made clear that, "[i]t is only if you choose to opt out that you need to take action. You must complete, sign, and submit the HEAR Opt-Out Form, available on the HEAR site, by midnight on August 31, 2018.  You will receive email confirmation of your decision to opt out, and a confidential record of your choice will be maintained by HR."

Prior to the deadline, Rittenhouse also received two GSK publications, an email newsletter and an article on the company's internal "intranet."  The intranet article encouraged employees to review the agreement and also advised them of the steps they needed to take to opt out of the arbitration component.  It further reminded them that they would be deemed to have agreed to arbitrate covered complaints if they did not expressly opt-out of the program before the deadline.  The newsletter contained a link which asked, "Have you seen your HEAR email?

Have you decided which choice is best for you?" If an employee clicked the link, she would be directed to the intranet article.

The deadline came and went, and Rittenhouse did not opt out of the arbitration component of the HEAR Program. At no point did GSK separately mail or email the HEAR Legal Agreement to its employees; it was only available for them to review on the HEAR website. Though Rittenhouse received and opened all the emails, and even forwarded one to other employees, Rittenhouse's opposition to GSK's motion to compel arbitration is based on a sworn affidavit in which she avers that she never read the HEAR Legal Agreement and did not agree or intend to agree to it.[2] For the reasons that follow, this argument is unavailing.

Beginning with basic principles, the FAA "establishes a strong federal policy in favor of compelling arbitration over litigation[,]" *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104 (3d Cir. 2000), so long as the parties agreed to arbitrate their disputes. *See Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 299 (2010) ("Arbitration is strictly a matter of consent, and thus is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit to arbitration." (emphasis in original) (internal citations and quotations omitted)). The parties agreed to arbitrate the dispute at hand only if they entered into a valid arbitration agreement and the dispute falls within the scope of the arbitration agreement. *Id.* ("[O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision

---

[2] Rittenhouse also argues that the agreement is unenforceable because GSK failed to disclose an impending reduction in its workforce, which she believes constitutes "fraud." Rittenhouse bears the burden of proving that the agreement is invalid, *Green Tree Fin. Corp.-Alabama*, 531 U.S. at 91-92, but she has not cited any legal authority to support of her position. *See* E. D. Pa. Civ. R. 7.1(c) ("Every motion . . . shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support the motion."). A "skeletal 'argument', really nothing more than an assertion," especially one not supported by legal authority, "does not preserve a claim. Especially not when the brief presents a passel of other arguments." *United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) (internal citations and quotations omitted). Accordingly, Rittenhouse's fraud argument will not be contemplated.

specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." (emphasis in original)); *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998).

Only the first question, whether there is a valid arbitration agreement, is in question here.[3] "When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Ailments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288 n.18 (3d Cir. 2017) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (internal citations and alterations omitted)). The parties agree Pennsylvania contract law governs, which provides that a contract is formed where there is mutual manifestation of an intent to be bound, sufficiently definite terms, and consideration. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009). Plaintiff disputes the first of these requirements, arguing that there was no mutual manifestation of an intent to be bound because she neither read the agreement nor expressly accepted its terms.

A party's failure to read a contract will not excuse her from being bound to its terms. *Schwartz v. Comcast Corp.*, 256 Fed. App'x 515, 518 (3d Cir. 2007) ("[W]here an offer is contained in a writing [a party] may, without reading the writing, manifest assent to it and bind himself without knowing its terms. . . . [A]n offeror or offeree who should be aware of [the terms of a writing] may be bound in accordance with them if he manifests assent." (alterations in original) (internal citation omitted)). Arbitration agreements are not exempt from this principle.

---

[3] The arbitration agreement contains a delegation clause which assigns the determination of the arbitrability of a dispute to an arbitrator. Moreover, the scope of the arbitration is broad; expressly encompassing any all claims except those expressly excluded. Such provisions are generally construed broadly. *See Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000) ("[W]hen phrases such as . . . 'arising out of' appear in arbitration provisions, they are normally given broad construction."). Additionally, Rittenhouse does not argue that her instant claims would not be covered by the arbitration agreement if it is valid and enforceable.

5

*Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 222 (3d Cir. 2008).

There is an exception to the rule: a party is excused from being bound to a contract that she never had access to review. *See, e.g.*, *Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 287-88 (Pa. Super. 2005). But, this case does not fall within the exception. It is undisputed that Rittenhouse received several emails with links to the HEAR site, which in turn linked to the arbitration agreement. Rittenhouse could have accessed and read the agreement at any point before the opt-out deadline passed. *See, e.g.*, *Stephenson v. AT&T Servs., Inc.*, 2021 WL 3603322, at *6 (E.D. Pa. Aug. 13, 2021) (compelling arbitration where employee received three emails with hyperlinks to the arbitration agreement).

Her argument that by "doing nothing" in response to GSK's communications about the arbitration agreement she did not assent to the arbitration agreement is equally unpersuasive. An employee's failure to opt-out of a voluntary arbitration program constitutes acceptance, especially where failure to opt-out is the exact form of acceptance invited by the offer. *See, e.g.*, *Stephenson*, 2021 WL 3603322, at *6; *Bracy*, 2020 WL 1953647, at *7; *Hoffman v. Compassus*, 2019 WL 1791413, at *6 (E.D. Pa. Apr. 23, 2019). This is because "[a]cceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent." *Morales*, 541 F.3d at 221. Thus, if an offeree, "acts or expresses itself as to justify the other party in inferring assent, and this action or expression was of such a character that a reasonable person in the position of the offeree should have known it was calculated to lead the offeror to believe that the offer had been accepted, a contract will be formed. . . ." *Id.* at 222 (internal citations and quotations omitted). Here, GSK told Rittenhouse several times that if she did not take steps to opt out of the program, her inaction would be construed as an agreement to arbitrate her future claims. Despite these warnings, Rittenhouse did not opt out of the arbitration agreement, and is

thus now bound to its terms.  GSK's motion to compel arbitration shall therefore be granted, and this action shall be stayed pending resolution of the arbitration proceedings.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

**WENDY BEETLESTONE, J.**